# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**TRACY SUBOH,**

   **Plaintiff,**  **:**

          **Case No. 2:20-cv-6295**
 **v.**        **Judge Sarah D. Morrison**
          **Magistrate Judge Chelsey M. Vascura**

**ABACUS CORPORATION,**  **:**

   **Defendant.**

## OPINION AND ORDER

Plaintiff Tracy Suboh brings this action against her former employer, Defendant Abacus Corporation, alleging violations of the Americans with Disabilities Act ("ADA"), Family Medical Leave Act ("FMLA"), and Ohio law. (Compl., ECF No. 1.) Abacus has filed for summary judgment on all claims. (Mot., ECF No. 21.) Ms. Suboh responded (Resp., ECF No. 25), and Abacus replied (Reply, ECF No. 28). At the Court's request, the parties filed supplemental briefing. (*See* ECF Nos. 32, 33.) Because a reasonable jury could find in favor of Ms. Suboh, Abacus's Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

### A. Ms. Suboh began working for Abacus in 2016.

The facts in this case are largely undisputed. Ms. Suboh started working for Abacus, a staffing agency, in April 2016. (Suboh Dep., ECF No. 21-2, PAGEID # 501. *See also* Brady Aff., ECF No. 21-1, ¶ 2.) Her first role with the company was as District Manager in the Columbus, Ohio branch office. (*Id.*, 12:18, 13:12–13.) As

District Manager, Ms. Suboh was responsible for the day-to-day operations of the branch, including marketing, sales, operations, customer service, recruitment, and overseeing on-site placements. (*Id.*, 12:18–14:13.) The role was "nonstop" and required Ms. Suboh to "[wear] many hats." (*Id.*, 13:2–9.)

**B.    In 2019, Ms. Suboh struggled with serious psychiatric health concerns. She was approved for four weeks of FMLA leave.**

Ms. Suboh began experiencing significant psychiatric health challenges in 2019. (*Id.*, 20:21–25.) She was hospitalized for five days that June. (*Id.*, 21:14–16.) Ms. Suboh used vacation time to cover her absence, and returned to the office immediately on release. (*Id.*, 22:1–4.) Four months later, Ms. Suboh was hospitalized again. (*Id.*, 24:5–7.) Her inpatient stay was followed by an intensive outpatient program ("IOP"). (*Id.*, 24:8–23.) The treatment took Ms. Suboh away from the office for four weeks. (*Id.*) Abacus approved Ms. Suboh's application for FMLA leave to cover that time. (*Id.*)

When Ms. Suboh returned to the office in November 2019, she was promoted to Regional Director of Operations. (Brady Aff., ¶ 5.) As Regional Director, Ms. Suboh was responsible for the Columbus market, as well as Abacus's expansion into Indiana and Chicago. (Suboh Dep., 27:24–28:12.)

**C.    In 2020, Ms. Suboh was approved to use her remaining eight weeks of FMLA leave. She then requested three additional weeks of non-FMLA medical leave.**

Six months after her promotion, Ms. Suboh once again required hospitalization. (*Id.*, 29:3–6.) She sent Abacus a certification from her treating psychiatrist, Jeffrey T. Pearch, D.O., dated June 8, 2020. (*Id.*, PAGEID # 516–19.)

2

Dr. Pearch noted that Ms. Suboh had been hospitalized from May 21 to May 28, and was being referred for participation in a six-to-eight week IOP. (*Id.*, PAGEID # 517.) He further stated that, as of June 8, Ms. Suboh was "unable to perform any of her job functions." (*Id.*) He explained:

> The patient is experiencing an acute exacerbation of depression and anxiety symptoms including symptoms of helplessness, a recent attempt at self harm, impairment in ability to concentrate, and heightened anxiety with panic attacks. An increased level of care such as IOP is warranted given the severity of these symptoms which persist despite recent inpatient treatment.

(*Id.*) The certification asked Dr. Pearch to "estimate the beginning and ending dates for the period of incapacity," to which he responded:

> 5/21/20 – 8/10/20 → (estimated return to work date following completion of IOP)

(*Id.*, PAGEID # 518.) Based on her conversations with Dr. Pearch, Ms. Suboh also had the "expectation . . . that [she] would return to work after the IOP was completed[,]" but understood that the August 10 return date was contingent, "because [Dr. Pearch] wanted to evaluate [her] progress." (*Id.*, 37:10–14, 75:7–8.)

On June 29, 2020, Abacus HR Business Partner Sabrina Rios sent Ms. Suboh an email, with the following letter attached:

> Dear Tracy:
>
> In response to your request for a leave of absence for your own serious health condition via FMLA, please be advised that your leave is approved **effective May 21, 2020 and will expire the week of July 20, 2020**.
>
> Please note the following:
>
> - For the weeks ending October 18, 2019 – November 15, 2019 you previously utilized four (4) weeks of leave under FMLA.

- If you currently have insurance through Abacus, you are responsible for your portion of the premiums during your absence.
    - If this is applicable to you, our Accounting team will invoice you separately.

Because your FMLA leave was the result of your own serious health condition, you must provide certification from your health care provider that specifies the date you are able to return to your job and your ability to perform the essential functions of your job with or without reasonable accommodation.

If you have any questions, please let me know.

(*Id.*, PAGEID # 515. *See also* ECF No. 25-1.)

Ms. Suboh responded, copying Abacus COO, Mike Brady, and VP of

Operations, Scott Ellison, among others, on July 6:

Thank you Sabrina,
I've spoken with my doctors and they still feel August 10th is when I should return. How does this effect [*sic*] my job?
Best,
Tracy

(ECF No. 25-1. *See also* Brady Dep., ECF No. 21-3, 7:1, 25:18–19.) Within ten

minutes, Mr. Brady emailed Ms. Rios:

We will coordinate reply tomorrow.

(ECF No. 25-1.) But Abacus never sent a reply to Ms. Suboh's email. (Suboh Dep.,

11:1–5.)

### D.     Ms. Suboh was terminated before returning to work.

Two weeks later, on July 21, Mr. Brady sent an email to Mr. Ellison, Ms.

Rios, Christopher Price (who filled in for Ms. Suboh during her leave), and Michele

Massaro (who was "very involved" in Abacus operations). (July 21 Email, ECF No.

4

25-2. *See also* Brady Dep., 25:18–24.) The message, marked with "High" importance,

bears the subject line:

> Tracy Suboh – Alicia Kern – Columbus

(July 21 Email.) It reads:

> Tracy Suboh has exhausted her job protection status under the FMLA and we are prepared to move forward an [*sic*] install a new market leader, Alicia Kern.
>
> We need to be very coordinated and organized in how we handle this.
>
> I will communicate with Tracy Suboh to advise her that her job protection has expired and that we have filled her role. I would like to be the single point of contact with her going forward. If she reaches out to you, certainly be kind and gracious, but refer her to me.
>
> That said, I am certain that within 2 seconds of our call, she will be on the phone with Dolores and possibly others in the branch. Therefore, we will need to be in communication with them, not to share the private personnel information, but to assure them of continuity in operations and new leadership. Also, they can have any personal relationship with Tracy that we [*sic*] choose to however, no work information should be shared by Dolores or others with Tracy.
>
> There may be some resistance to new leadership; the branch may give her the hard way to go. We cannot allow that if detected.
>
> Chris, you have been interim market leader; need your thoughts. Michele/Scott, need your input on timing too. I would like to tie off with Tracy as soon as reasonable but not until we get our ducks in a row!

(*Id.*)

Mr. Brady reached Ms. Suboh via phone on July 27 and "[told her] that

[Abacus] had decided that they needed to move on." (Suboh Dep., 77:6–8.)

Ms. Suboh attempted to salvage her relationship with Abacus. She reached

out to Ms. Massaro and Mr. Ellison, "begging them to reconsider their decision."

(*Id.*, 77:14–17.) They both reiterated that it was time "to move on." (*Id.*, 78:1–5, 80:15–17.) She also exchanged text messages with Mr. Brady, asking:

> Can I just have a new role in the company? I work so well onsite people love me and maybe I could be a trainer? . . . I would enjoy being a trainer for our onsite accounts.

(*Id.*, PAGEID # 493.) Mr. Brady responded:

> We can cross that bridge down the line. Keep working on yourself, when you get to a point where you are released from care, we can talk it out

(*Id.*)

Ms. Suboh was cleared to return to work without restrictions on August 31, 2020. (*Id.*, PAGEID # 513.)

### E.    Ms. Suboh filed suit.

Ms. Suboh filed an EEOC charge and ultimately received a Right to Sue letter. (ECF No. 1-1.) She filed her Complaint shortly thereafter. (Compl., ECF No. 1.) Ms. Suboh asserts seven claims against Abacus, including:

**Count I**     Disability Discrimination (Ohio Rev. Code § 4112.02)

**Count II**    Disability Discrimination (ADA)

**Count III**   Retaliation (Ohio Rev. Code § 4112.02)

**Count IV**    Retaliation (ADA)

**Count V**     Failure to Accommodate (ADA)

**Count VI**    Failure to Accommodate (Ohio Rev. Code § 4112.02)

**Count VII**   Retaliation (FMLA)

(*Id.*) Abacus now moves for summary judgment. (Mot.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

The Sixth Circuit recently pointed out why cases like Ms. Suboh's are so important:

> Nearly one in every five Americans has a disability. MATTHEW W. BRAULT, U.S. CENSUS BUREAU, AMERICANS WITH DISABILITIES: 2010 4 (2012). Yet at the time of the last census report, a mere 41% of people with disabilities between the ages of 21 and 64 were employed. *Id.* Although "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society," 42 U.S.C. § 12101(a)(1), these numbers reflect the harsh reality that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged . . . economically," *id.* § 12101(a)(6).

*Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848 (6th Cir. 2018).

The court went on to explain that

> Congress passed the Americans with Disabilities Act in 1990 to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(8) (pre-2008 amendments). To that end, the law broadly prohibits "discriminat[ion] against a qualified individual on the basis of disability" as it applies to aspects of employment including hiring, advancement, and firing. 42 U.S.C. § 12112(a).

*Id.* "The Ohio anti-discrimination law mirrors the ADA, so [the Sixth Circuit] applies the legal standard under the ADA to claims brought under both laws." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) (collecting cases). *See also* Ohio Rev. Code § 4112.02(A). Accordingly, Ms. Suboh's federal and state claims are analyzed together. For ease of analysis, the claims are addressed out of order.

## A. Failure to Accommodate (Counts V, VI)

The Court begins with Ms. Suboh's claim that Abacus failed to accommodate her disability, in violation of the ADA and Ohio law. (*See* Compl., ¶¶ 61–84.)

Under the ADA, an employer unlawfully discriminates against an employee when it does not make "reasonable accommodations" to the employee's known disability—*unless* the accommodation would be an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). *See also Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). "[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007)). Accordingly, the Court "jettison[s] the familiar" burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and instead applies a different framework. *Kleiber*, 485 F.3d at 869. First, Ms. Suboh must make a *prima facie* showing that Abacus failed to accommodate her known disability and that her proposed accommodation was reasonable. If she does, "the burden shifts to [Abacus] to demonstrate that [the] particular accommodation would impose an undue hardship[.]" *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011).

### 1. A reasonable jury could find that Abacus discriminated against Ms. Suboh by failing to provide reasonable accommodation for her disability.

To make out a *prima facie* case for failure to accommodate,

> a plaintiff must show that (1) she was disabled within the meaning of
> the statute; (2) she was otherwise qualified for her position, with or
> without reasonable accommodation; (3) the defendant knew or had
> reason to know about her disability; (4) she requested an
> accommodation; and (5) the defendant failed to provide the necessary
> accommodation.

*King*, 30 F.4th at 560 (citation and internal quotation marks omitted) (cleaned up).

"[T]he burden of making out a *prima facie* case is not an onerous one." *Hostettler*,

895 F.3d at 855. The only element in dispute here is whether Ms. Suboh was

otherwise qualified for her position, with or without reasonable accommodation.

(*See generally* Mot.) Ms. Suboh contends that her request for three additional weeks

of medical leave was a reasonable accommodation, with which she would have been

able to return to Abacus and perform the essential functions of her job. (Resp., 13,

16.) On this record, a reasonable jury could agree.

    <u>Reasonable accommodation</u>. The Sixth Circuit has long held that a period of

medical leave can be a reasonable accommodation. *Cehrs v. Ne. Ohio Alzheimer's*

*Rsch. Ctr.*, 155 F.3d 775, 782 (6th Cir. 1998). When an employee requests medical

leave as an accommodation, the Sixth Circuit "focus[es] on the reasonableness of the

request." *King*, 27 F.4th at 562. A plaintiff "bears the burden of showing that an

'accommodation seems reasonable on its face.'" *Blanchet*, 27 F.4th at 1229 (quoting

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "Determining the

reasonableness of a proposed accommodation is a question of fact." *Id.* at 1229–30

(quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)). In

assessing the reasonableness of a request for medical leave, courts in this Circuit

consider:

(1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery.

*King*, 27 F.4th at 562 (collecting cases).

Applied here, the *King* factors weigh in favor of finding that Ms. Suboh's request was reasonable. As to the first and third factors: Ms. Suboh requested unpaid medical leave to complete a six-to-eight week IOP. Her treating psychiatrist estimated that she would need until August 10, 2020—just three additional weeks—to recover from the "acute exacerbation" of her condition. As to the second, although the record suggests that Abacus has leave policies (*see* ECF No. 21-2, PAGEID # 484), there is no clear indication of whether the requested leave would comply with, or fall outside of, any such policies.

<u>*Otherwise qualified*</u>. "To show that she is otherwise qualified for a position . . . an employee must show that she can perform the essential functions of a job with or without an accommodation." *Hostettler*, 895 F.3d at 854. "[E]ssential functions are the core job duties, not the marginal ones." *Id.* (citing 29 C.F.R. § 1630.2(n)(1)).

Ms. Suboh had been employed with Abacus for several years, during which time she received raises and promotions, and "no write-ups." (*See* Suboh Dep., 17:16–17.) She testified:

> **[Ms. Suboh]:** . . . [O]nce I had gotten out of the hospital, I was prepared to go in and really make a difference and turn it around in the office.

> **[Attorney]:** When you say out of the hospital, which time was that?

11

> **[Ms. Suboh]:** That was the last time – that was that last time in July when I was terminated.
>
> **[Attorney]:** Okay.
>
> **[Ms. Suboh]:** I was prepared to – I had the mental therapy that I needed and I felt that I was capable of going in and just really changing things, you know, righting the ship.

(*Id.*, 19:10–22.) Indeed, she "was actually eager to get back." (*Id.*, 46:15.) After being terminated, Ms. Suboh secured a position as an Operations Manager with a competitor staffing agency. (*Id.*, 50:21–51:3.) Although Ms. Suboh ultimately resigned that position, it was not for lack of competence. (*Id.*, 53:8–13.)

Abacus puts forward several arguments why Ms. Suboh fails to make a *prima facie* showing: first, that medical leave exempts Ms. Suboh from in-person attendance, which was an essential function of her job; second, that Ms. Suboh requested an indefinite period of medical leave; third, that the requested leave would not have permitted her to return to work; and fourth, that the requested leave imposed an undue hardship on Abacus. (*See generally*, Mot.) The first three arguments fail, and Abacus fails to carry its burden on the fourth.

<u>*In-person attendance*</u>. Abacus first argues that Ms. Suboh's requested accommodation (three weeks of medical leave) is not a reasonable one because it exempts her from an essential function of her job—in-person attendance. (Mot., 15.) "In failure-to-accommodate claims where the employee requests an accommodation that exempts her from an essential function, the essential function and reasonable accommodation analyses run together. One conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *EEOC v. Ford Motor Co.*,

782 F.3d 753, 763 (6th Cir. 2015) (*en banc*) (internal quotations, citation, and alteration omitted).

Abacus relies on *EEOC v. Ford Motor Co.*, in which the Sixth Circuit identified a "general rule that, with few exceptions, an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Id.* at 761 (internal quotation and citation omitted). The employee at issue in *Ford Motor* worked in a highly interactive role as a steel buyer, but suffered from a medical condition that made regular attendance in the office difficult. She requested the ability to telecommute up to four days each week. Ford had previously tried to accommodate her disability with "telecommuting trials and specialized plans to improve her attendance[,]" none of which were successful. *Id.* at 766. The proposed "*ad hoc* telecommuting schedule" was a bridge too far for Ford, and for the court. *Id.*

Abacus sees itself as the Ford Motor of this case. In its view, in-person attendance was an essential function of Ms. Suboh's job—her requested absence exempted her from that essential function and was, *ipso facto*, unreasonable. But more recent Sixth Circuit cases, with more analogous facts, make clear that *Ford Motor*'s analysis is not a perfect fit. *See, e.g., King*, 30 F.4th at 561–562 (concluding that *Ford Motor* "cannot automatically apply where medical leave would enable the employee to return to work and perform the essential job duties"); *Hostettler*, 895 F.3d at 857 (concluding that "full-time presence at work is not an essential function of a job simply because an employer says that it is"). In *Blanchet v. Charter Communications, LLC*, the Sixth Circuit discussed a failure-to-accommodate claim

13

brought by a high-performing employee whose postpartum depression prevented an on-time return from parental leave, causing her to request additional time off. 27 F.4th at 1228. Charter argued that Ms. Blanchet was not otherwise qualified because she "could not perform any of her essential job functions 'as of the date of her termination, including attending work.'" *Id*. at 1229. Rejecting the argument, the court explained:

> When an employee's proposed accommodation is medical leave, examining her qualifications on the date of her termination does not indicate whether she is otherwise qualified with an accommodation. Employees requesting medical leave often cannot perform their jobs when they request leave, and medical leave allows them time to recover from illnesses or medical procedures. To accept Charter's supposed rule, an employee requesting medical leave could always be terminated if she were unable to work at the time of her request. But that cannot be the case because we have held that "medical leave can constitute a reasonable accommodation under the ADA." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). We must therefore determine whether Blanchet would be "otherwise qualified" to perform her essential job functions with her proposed accommodation, in other words, when she returned to work.

*Id*. The court distinguished *Ford Motor*, noting that Ms. Blanchet "was not requesting an accommodation that would permanently remove attendance as a requirement for her position, by, for example, allowing her to telework or work part-time." *Id*. Instead, she sought a "temporary accommodation in the hopes that she could fully fulfill the attendance requirement once her medical leave was over." *Id*. The same distinction applies here.

_Estimated return-to-work date_. Abacus next argues that Ms. Suboh's leave request was unreasonable because it was "for an indeterminate duration." (Mot., 8.) "[W]here an employer has already provided an employee with a lengthy period of

medical leave, an extension to that leave can be a reasonable accommodation only when its duration is definite." *Maat v. Cnty. Of Ottawa*, 657 F. App'x 404, 412 (6th Cir. 2016). The "relevant inquiry" is whether the requested medical leave has "a certain or credibly proven end," *id.* (quoting *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 298 (6th Cir. 2015))—in other words, whether the employee has shown a "clear prospect[] of recovery." *Williams*, 847 F.3d at 394 (quoting *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)).

Abacus maintains that Ms. Suboh's request did not pass muster because Dr. Pearch provided only "an estimated return-to-work date[,]" which was contingent on her successful completion of IOP. (Mot., 9.) While "[a] physician's estimate of a return date alone does not necessarily indicate a clear prospect for recovery[,]" *Williams*, 847 F.3d at 394, Ms. Suboh had more than just an estimated date—she had a plan for, and a path to, recovery: a six-to-eight week IOP overseen by her treating psychiatrist.[1] *See Blanchet*, 27 F.4th at 1231 (contrasting Ms. Blanchet's prospect of recovery with the plaintiffs' in *Williams* and *Walsh* by noting that she had a positive employment history and was in active treatment).

*Sufficient to enable return*. Abacus further argues that Ms. Suboh's failure-to-accommodate claim must fail because the accommodation she requested would not have enabled her return. (Mot., 11.) Logic dictates, and case law confirms, that a

---

[1] Abacus tries to further support its position by noting that Ms. Suboh was still symptomatic at her August 10, 2020 appointment with Dr. Pearch and was not medically released to work until August 31. (Mot., 10.) However, "a reasonable jury could find not-at-all surprising that an unexpected termination would derail [Ms. Suboh's] recovery from mental illness, requiring her to take more time off from work." *Blanchet*, 27 F.4th at 1229.

proposed accommodation is not a reasonable one if it "would [not] allow [the employee] to perform the essential functions of her job." *Williams*, 847 F.3d at 393 (citing *Ford Motor*, 782 F.3d at 763). Abacus cites Ms. Suboh's deposition testimony for the proposition that, in addition to three weeks of medical leave, she needed accommodations including terminating one employee, hiring three additional employees, and reducing her job duties. (Mot., 12.) However, in context and drawing all reasonable inferences in Ms. Suboh's favor, the cited deposition testimony does not identify disability accommodations so much as it identifies what Ms. Suboh felt was necessary to 'right the ship.' She sought a more clearly defined role, the ability to prioritize major projects, a deeper bench of recruiters, a salesperson with local market ties, additional education and training for staff, and more direction from leadership on "how to grow the business[.]" (*See* Suboh Dep., 57:5–61:25.) These are not requests for accommodations—they are a manager's wish-list. (*See also* Suboh Dep., 74:23–75:8.) Abacus's argument, therefore, fails.

*Undue hardship*. Finally, Abacus argues that Ms. Suboh's requested three weeks of medical leave imposed an undue hardship on the business. (Mot., 13.) The ADA defines "undue hardship" to mean "an action requiring significant difficulty or expense, when considered in light of" the following factors:

> (i) the nature and cost of the accommodation needed . . . ;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10).

Abacus maintains that "after she started FMLA leave in May of 2020, Ms. Suboh's branches declined in performance" and that the "lack of leadership in her absence . . . affected productivity." (Brady Decl., ¶¶ 10–11.) The record contains no more specific information or evidence going to any of the four factors. Such vague and conclusory assertions are an insufficient basis on which to conclude that no genuine issue of material fact exists. *Cf. King*, 30 F.4th at 568 (noting that the employer bears the burden of establishing undue hardship and finding that the defendant failed to do so).

### 2. A reasonable jury could find that Abacus failed to engage in the interactive process.

Ms. Suboh's failure-to-accommodate claim also alleges that Abacus failed to engage in the interactive process required by the ADA. (*See, e.g.*, Compl., ¶ 70.) "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process" through which the parties "'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Hostettler*, 895 F.3d at 857 (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 605–06 (6th Cir. 2018)). *See also* 29 C.F.R. § 1630.2(o)(3). The interactive process requires an

17

employer to engage in "an individualized inquiry to determine whether a reasonable accommodation can be made." *Hostettler*, 895 F.3d at 857 (internal quotation and citation omitted). "Both parties must participate in this process and do so in good faith." *Jakubowski*, 627 F.3d at 202 (citing *Kleiber*, 485 F.3d at 871). "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the [employee]." *Id.* at 203.

Ms. Suboh first provided Dr. Pearch's June 8 medical certification requesting an additional three weeks of medical leave, and later confirmed to Ms. Rios that her doctors' recommendation had not changed. She asked how the additional time out of the office would affect her job and was met with radio silence—that is, until she received Mr. Brady's July 27 phone call terminating her employment. "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *King*, 30 F.4th at 567 (quoting *Cutrera v. La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)). But a reasonable jury could find that is exactly what happened here.

Abacus's Motion for Summary Judge on Counts V and VI is **DENIED**.

## B.    Disability Discrimination (Counts I, II)

Ms. Suboh further alleges that Abacus discriminated against her on the basis of her disability when it terminated her employment. (Compl., ¶¶ 25–48.) The Court

18

analyzes such claims under the *McDonnell Douglas* burden-shifting framework.[2]

*Williams*, 847 F.3d at 395. Under *McDonnell Douglas*, a plaintiff must first make a

*prima facie* case of discrimination by showing that: (1) she has a disability; (2) she is

otherwise qualified for the position, with or without reasonable accommodation;

(3) she suffered an adverse employment decision; (4) her employer knew or had

reason to know of the disability; and (5) she was replaced or her position remained

open. *Id.* (quoting *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011)). "[T]he

burden then shifts to the employer to demonstrate that there was a legitimate,

nondiscriminatory reason for the adverse employment action." *Id.* On such

demonstration, the burden shifts back to the plaintiff, who "must then show that

the reason given by the employer was actually a pretext designed to mask unlawful

discrimination." *Id.*

    Here, too, the only disputed element of the *prima facie* case is whether Ms.

Suboh was otherwise qualified for the position, with or without reasonable

---

[2] Discrimination claims supported by direct evidence and indirect evidence
are analyzed under different tests. *See Hostettler*, 895 F.3d at 852–53. ADA "claims
premised upon an employer's failure to offer a reasonable accommodation
necessarily involve direct evidence (the failure to accommodate) of discrimination."
*Kleiber*, 485 F.3d at 829. The Sixth Circuit has applied the direct evidence test to
ADA discrimination claims that are "based on [the employer's] failure to
accommodate," even though they were not titled or pled as "failure to accommodate"
claims. *Blanchet*, 27 F.4th at 1227. Here, Ms. Suboh asserts both failure to
accommodate and general disability discrimination claims. The Court construes
Counts I and II as alleging discriminatory discharge proved by *indirect* evidence
and analyzes it as such. (*See* Resp., 9 (utilizing the *McDonnell Douglas* burden-
shifting test to argue that "the facts give rise to an inference of discrimination")).
Counts V and VI, for failure to accommodate, are analyzed, *supra*, using the direct
evidence test.

accommodation. (*See* Mot.) For the reasons set forth in Section III.A., *supra*, the Court finds that Ms. Suboh has satisfied her burden. The Court turns next to Abacus's stated reason for terminating Ms. Suboh's employment—that she was unavailable to return to work after the end of her FMLA leave. Though the Court seriously doubts that this reason passes for nondiscriminatory,[3] the question's importance fades because Ms. Suboh raises a genuine issue of material fact as to whether the reason is pretextual.

To establish pretext, a plaintiff must show that the employer's proffered reason "(1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to warrant her removal." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 422 (6th Cir. 2021). "Although a plaintiff cannot rest solely on temporal proximity to establish pretext, suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* (internal quotation and citation omitted). Here, the record reveals a glaring inconsistency in the circumstances leading to Ms. Suboh's termination which, in combination with the "suspicious timing," requires presentation to a jury. *See Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (concluding that inconsistent statements from individuals involved in plaintiff's termination created a question of material fact).

---

[3] Ms. Suboh was unavailable to present for work on July 21, 2020, because of her disability. *Cf., Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (concluding that the plaintiff's "disability was a 'but-for' cause of his termination" because he "would not have been terminated had he not asked about taking leave to treat his medical conditions").

Ms. Suboh was told that her FMLA leave would run on July 20, 2020. By July 21, Abacus was "prepared to move forward an[d] install a new market leader, Alicia Kern." (July 21 Email.) Mr. Brady's email announcing the move makes clear that Ms. Kern was intended to "fill[ Ms. Suboh's] role." (*Id.*) Mr. Brady stated his intention "to tie off with Tracy as soon as reasonable[.]" (*Id.*) But, in contrast to the resolute language of the July 21 Email, Mr. Brady testified in deposition that Ms. Suboh's termination "wasn't a foregone conclusion," and, "had Tracy been able to return to work, [Ms. Kern] would have reported to her and worked for her." (Brady Dep., 16:19–22, 21:19–21.) The apparent discord can be resolved only with a credibility determination—and that must be done by a jury.

Abacus's Motion for Summary Judgment on Count I and II is **DENIED**.

### C. Retaliation (Counts III, IV, and VII)

Finally, Ms. Suboh alleges that Abacus retaliated against her in violation of the FMLA, ADA, and Ohio law. (Compl., ¶¶ 49–60, 85–90.) Retaliation claims based on indirect evidence are also analyzed under the *McDonnell Douglas* burden-shifting framework. *Ford Motor*, 782 F.3d at 767. "The *prima facie* case for retaliation under [the ADA and the FMLA] is practically identical." *Wyatt*, 999 F.3d at 419. A plaintiff must show that

> (1) [she] engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff . . ., and (4) there was a causal connection between the protected activity and the adverse employment action . . . .

*Id.* (collecting cases).

Abacus first argues that Ms. Suboh fails to establish a causal connection between the exercise of her ADA and FMLA rights and her termination. (Mot., 21.) "[T]he plaintiff's burden at the *prima facie* stage is minimal and easily met." *Wyatt*, 999 F.3d at 419 (internal quotation and citation omitted). "[A]ll the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger v. Cincinnati Bell. Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (internal quotation and citation omitted). The Sixth Circuit has found that, where the protected activity and the adverse employment action occur "acutely near in time," that temporal proximity can be sufficient to establish a *prima facie* showing of causation. *Id.* (collecting cases). *See also Wyatt*, 999 F.3d at 419. As applied here, Ms. Suboh's exercise of her ADA and FMLA rights could scarcely be more acutely near her termination. Ms. Suboh has made her *prima facie* case.

Abacus next argues that its "legitimate reason" for terminating Ms. Suboh—"her inability to return to work following the expiration of FMLA leave" —was not pretextual. (Mot., 21.) For the same reasons as in Section III.B., *supra*, the Court finds that a genuine issue of material fact exists as to whether Abacus's stated reason for terminating Ms. Suboh was mere pretext for unlawful retaliation.

Abacus's Motion for Summary Judgment on Counts III, IV, and VII is **DENIED**.

## IV.  CONCLUSION

For the reasons set forth above, Abacus's Motion for Summary Judgment is

**DENIED**. A trial scheduling order will follow.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**